# UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| **Stephen White, Rhonda White,** | ) | |
| **Walter Baty,** | ) | |
| **Ivern Shaw, Buster Shaw,** | ) | |
| **Patrick Gammill, Stephanie Gammill,** | ) | |
| **Bryan Box, Staci Box,** | ) | |
| **James Morris, Shirley Morris,** | ) | |
| **Jim Morris,** | ) | |
| **Jody White, William Reed,** | ) | |
| **Joe Chandler, Michael Chandler,** | ) | |
| **Alex Avila, John Newman** | ) | |
| **Tommy Chandler, Nelda Chandler,** | ) | |
| **Ray Raines, Allie Rains,** | ) | |
| **Susan McGee, Bradley McGee,** | ) | |
| **Van Vaught,** | ) | **CIVIL ACTION NO:  2:07-CV-522** |
| **Kenny Barrett, Becky Barrett,** | ) | |
| **Clarence Brown,** | ) | |
| **George Millord,** | ) | |
| **Alan Vaught,** | ) | |
| **Carlton Ballow, Christina Ballow,** | ) | |
| **Steve Rector, Mary Ann Rector,** | ) | |
| **Gerald Lampin, Sharon Lampin,** | ) | |
| **Tina Lee,** | ) | |
| **Herman Woodson, Martha Woodson,** | ) | |
| **Jerry Scates, Barbara Scates,** | ) | |
| **Jory Muckleroy, April Muckleroy,** | ) | |
| **Charlie Muckleroy, Rita Muckleroy,** | ) | |
| **Don Lovell, Louise Rambin,** | ) | |
| **Royce Johnson, Louise Johnson,** | ) | |
| **Gary McCann, Trellis McCann,** | ) | |
| **Cynthia Dee Davis, Gloria Davis,** | ) | |
| **John Shoemaker, Mary Shoemaker,** | ) | |
| **Hoa Phan, Tracy Phan** | ) | |
| **Billy Ray Butler, Shirley Butler** | ) | |
| **James Young, Verna Young** | ) | |
| **Michael Young, Stacy Young,** | ) | |
| **Patrick  Parker, Angela Parker,** | ) | |
| **Myrna Jernigan,** | ) | |
| **Roger Beard, Nadine Beard,** | ) | |

Plaintiffs' Original Complaint

|                                  |     |
|----------------------------------|-----|
| **Plaintiffs**                   | )   |
| **V.**                           | )   |
|                                  | )   |
| **PILGRIM'S PRIDE CORPORATION**  | )   |
| **AND LONNIE "BO" PILGRIM,**     | )   |
|                                  | )   |
| **Defendants**                   | )   |

## <u>PLAINTIFFS' ORIGINAL COMPLAINT</u>

COME NOW, Plaintiffs Stephen White, Rhonda White, Walter Baty, Ivern Shaw, Buster Shaw, Patrick Gammill, Stephanie Gammill, Bryan Box, Staci Box, James Morris, Shirley Morris, Jim Morris, Jody White, William Reed, Joe Chandler, Michael Chandler, Alex Avila, John Newman, Tommy Chandler, Nelda Chandler, Ray Raines, Allie Rains, Susan McGee, Bradley McGee, Van Vaught, Kenny Barrett, Becky Barrett, Clarence Brown, George Millord, Alan Vaught, Carlton Ballow, Christina Ballow, Steve Rector, Mary Ann Rector, Gerald Lampin, Sharon Lampin, Tina Lee, Herman Woodson, Martha Woodson, Jerry Scates, Barbara Scates, Jory Muckleroy, April Muckleroy, Charlie Muckleroy, Rita Muckleroy, Don Lovell, Louise Rambin, Royce Johnson, Louise Johnson, Gary McCann, Trellis McCann, Cynthia Dee Davis, Gloria Davis, John Shoemaker, Mary Shoemaker, Hoa Phan, Tracy Phan, Billy Ray Butler, Shirley Butler, James Young, Verna Young, Michael Young, Stacy Young, Patrick Parker, Angela Parker, Myrna Jernigan, Roger Beard, and Nadine Beard ("Plaintiffs") and for causes of action against Defendant Pilgrim's Pride Corporation and Lonnie "Bo" Pilgrim ("Defendants") would show as follows:

# I.

## NATURE OF THE ACTION

1.      Because of its size, wealth, and market control, Pilgrim's Pride Corporation ("Pilgrim") is in a position to misuse its economic power over chicken growers.  It dominates every aspect of the business of those growers through which it raises chickens for distribution into the stream of commerce.  Currently, Pilgrim is the second largest chicken producer in the country, producing over six billion pounds of 'broilers" -- or chickens raised for meat -- per year. As set forth in this complaint, Pilgrim has in fact misused that power, by violating its contracts with growers, committing violations of the Packer and Stockyards Act, committing violations of the Fair Labor Standards Act, committing widespread fraud, engaging in preferential treatment for insiders, manipulating its data and chick distribution, and converting the assets of its growers. The company's founder and CEO, Lonnie "Bo" Pilgrim ("Bo Pilgrim"), has conspired with Pilgrim to commit various acts of self-dealing and deceptive trade practices. The plaintiffs in this action are a group of forty-one families who operate chicken farms for Pilgrim's in East Texas.

2.      This is a legal challenge and suit for damages against Pilgrim and Bo Pilgrim based upon the way they have illegally and unfairly dealt with Plaintiffs.  Through a series of threats, demands and acts of self-dealing, Pilgrim and Bo Pilgrim have systematically and purposefully destroyed the value of Plaintiff's poultry farms and businesses to unilaterally increase its own economic power and profits. Plaintiffs bring suit against Pilgrim and Bo Pilgrim for the commission of deceptive trade practices violations and conspiracy to commit deceptive trade practices violations.  In this action, Plaintiffs further seek a declaration that, under the Fair

Labor Standards Act, they have actually been employees rather than independent contractors of Pilgrim's, and bring suit for damages arising from breach of contract, fraud, deceptive trade practices and conspiracy.

## II.

## PARTIES

3.      Pilgrim's Pride Corporation is a Delaware corporation with its principal place of business located in Pittsburg, Camp County, Texas.  Pilgrim's is a resident of this District and resides in one of the counties, Camp County, within the Marshall Division of this District.

4.      Lonnie "Bo" Pilgrim is a resident of Texas.  Upon information and belief, Bo Pilgrim resides in Camp County, Texas.  Bo Pilgrim is a resident of this District and resides in one of the counties, Camp County, within the Marshall Division of this District

5.      Stephen White and Rhonda White are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Cushing, Texas.

6.      Walter Baty is a citizen of the State of Texas and residents of this District.  He owns and operates a boiler farm in Center, Texas.

7.      Ivern Shaw and Buster Shaw, are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Cherino, Texas.

8.      Patrick Gammill and Stephanie Gammill are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Huntington, Texas.

9.      Bryan Box and Staci Box are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Timpson, Texas.

Plaintiffs' Original Complaint

10.     James Morris and Shirley Morris are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Carthage, Texas.

11.     Jim Morris is a citizen of the State of Texas and resident of this District.  He owns and operates a boiler farm in Carthage, Texas.

12.     Jody White is a citizen of the State of Texas and residents of this District.  He owns and operates a boiler farm in Mt. Enterprise, Texas.

13.     William Reed is a citizen of the State of Texas and resident of this District.  He owns and operates a boiler farm in Center, Texas.

14.     Joe Chandler and Michael Chandler are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Garrison, Texas.

15.     Alex Avila is a citizen of the State of Texas and residents of this District.  He owns and operates a boiler farm in Nacogdoches, Texas.

16.     John Newman is a citizen of the State of Texas and residents of this District.  He owned and operated a boiler farm in Nacogdoches, Texas.

17.     Tommy Chandler and Nelda Chandler are citizens of the State of Texas and residents of this District.  They owned and operated a boiler farm in Nacogdoches, Texas.

18.     Ray Raines and Allie Rains are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Center, Texas.

19.     Susan McGee and Bradley McGee are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Cherino, Texas.

20.     Van Vaught is a citizen of the State of Texas and residents of this District.  He owns and operates a boiler farm in Nacogdoches, Texas.

21.     Kenny Barrett and Becky Barrett are citizens of the State of Texas and residents of this District.  They owned and operated a boiler farm in Nacogdoches, Texas.

22.     Clarence Brown is a citizen of the State of Texas and resident of this District.  He owns and operates a boiler farm in Cherino, Texas.

23.     George Millord is a citizen of the State of Texas and residents of this District.  He owned and operated a boiler farm in Nacogdoches, Texas.

24.     Alan Vaught is a citizen of the State of Texas and resident of this District.  He owns and operates a boiler farm in Mt. Enterprise, Texas.

25.     Carlton Ballow and Christina Ballow are citizens of the State of Texas and resident of this District.  They own and operate a boiler farm in Nacogdoches, Texas.

26.     Steve Rector and Mary Ann Rector are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Wooden, Texas.

27.     Gerald Lampin and Sharon Lampin are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Nacogdoches, Texas.

28.     Tina Lee is a citizen of the State of Texas and resident of this District.  She owns and operates a boiler farm in Nacogdoches, Texas.

29.     Herman Woodson and Martha Woodson are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Martinsville, Texas.

Plaintiffs' Original Complaint

30.     Jerry Scates and Barbara Scates are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Center, Texas.

31.     Jory Muckleroy and April Muckleroy are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Nacogdoches, Texas.

32.     Charlie Muckleroy and Rita Muckleroy are citizens of the State of Texas and residents of this District.  They are part owners a boiler farm in Nacogdoches, Texas.

33.     Don Lovell is a citizen of the State of Texas and residents of this District.  He owns and operates a boiler farm in Center, Texas.

34.     Louise Rambin is a citizen of the State of Texas and resident of this District.  She owned and operated a boiler farm in Nacogdoches, Texas.

35.     Royce Johnson and Louise Johnson are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Center, Texas.

36.     Gary McCann and Trellis McCann are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Center, Texas.

37.     Cynthia Dee Davis and Gloria Davis are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Center, Texas.

38.     John Shoemaker and Mary Shoemaker are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Pollok, Texas.

39.     Hoa and Tracy Phan are citizens of the State of Texas and residents of this District.  They owned and operated a boiler farm in Pollok, Texas.

Plaintiffs' Original Complaint

40.     Shirley Butler Farm and Billy Ray Butler are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Wooden, Texas.

41.     James Young and Verna Young are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Wells, Texas.

42.     Michael Young and Stacy Young are citizens of the State of Texas and residents of this District.  They own and operate a boiler farm in Wells, Texas.

43.     Patrick Parker and Angela Parker are citizens of the State of Indiana.   They owned and operated a boiler farm in Nacogdoches, Texas.

44.     Myrna Jernigan is a citizen of the State of Texas and resident of this District.  She owns and operates a boiler farm in Huntington, Texas.

45.     Roger Beard and Nadine Beard are citizens of the State of Texas and residents of this District.  They own and operate a poultry farm in Mt. Enterprise, Texas.

## III.

## JURISDICTION AND VENUE

46.     Plaintiffs herein make claims in this action under the Fair Labor Standards Act of 1938, 29 U.S.C. 201 - 209.  This Act states that Plaintiffs may bring an action for its violation in any federal district court, which court has "original jurisdiction."   29 U.S.C. 216(b).   No administrative remedy, prior filing or other process must be exhausted prior to bringing this original federal court action under the Federal Labor Standards Act.  Plaintiffs seek to recover damage and costs of suit for the injuries sustained as a result of the Deceptive Trade Practices Act violations, breach of contract and other state law violations committed by Pilgrim.  The

Court has supplemental jurisdiction over the entirety of this action under 28 U.S.C. 1367(a), on the appended federal claims as the parties are not diverse.

47.     Pilgrim's corporate office and principal place of business is in the Eastern District of Texas, making it subject to personal jurisdiction in this District if the Eastern District of Texas was a separate state.

48.     Venue is proper in the Eastern District of Texas, Marshall Division, because during the periods in question Pilgrim and Bo Pilgrim resided, transacted business and had employees in this District and Division, and because a substantial part of the events giving rise to Plaintiffs' claims and a substantial portion of the affected interstate trade and commerce described below have been carried out in this District and Division.

## IV.

## INTERSTATE TRADE AND COMMERCE

49.     Pilgrim's conduct, described herein, was in and has affected interstate commerce. Pilgrim's annual revenues are in excess of a billion dollars.  Its products are distributed to grocery stores, fast food and other retail outlets throughout the United States and are consumed throughout the United States.  Further, Pilgrim enters into grower contracts with farmers throughout the United States.

50.      Pilgrim's conduct is within interstate trade and commerce and has a substantial effect upon interstate trade and commerce.

Plaintiffs' Original Complaint

## V.

## UNDERLYING FACTS

51.     Pilgrim is a vertically integrated company that controls the production, processing, and distribution of broilers.  Within the poultry business, Pilgrim is known as an "integrator."  This means that Pilgrim owns and operates the entire means of producing chicken meat, including breeder flocks, pullet farms, breeder houses, hatcheries, feed mills, processing plants, and distribution centers.  Pilgrim geographically divides its broiler operations into "complexes," spread over different regions of the United States.  Each complex has at least one pullet farm, breeder farm, hatchery, feed mill and processing plant.  Pilgrim completely controls the operations through which broilers are produced.  It collects eggs from hens on its breeder farms, then sends them to a company-owned hatchery.  After they are hatched, Pilgrim sends them to contract growers who raise the broilers as directed by Pilgrim, with Pilgrim controlling the manner and means of the contractual growers' day to day activities in connection raising its broilers.

52.     Pilgrim delivers feed to the contract growers.  This feed is manufactured and mixed by Pilgrim and includes numerous artificial growth agents.  The growers are not permitted to alter the composition of the feed or add to it.  Pilgrim creates feed that, in its opinion, will grow broilers to maturity over the shortest growth period.  Currently, the grow-out period for Pilgrim's broilers is between thirty seven and fifty days.  Pilgrim designates when this period is complete for each grower and, on the day it selects, Pilgrim travels to the broiler farms and, with its employee catchers, catches the broilers and transports them to its processing plant.  At the

Plaintiffs' Original Complaint

plant, the broilers are slaughtered, cut and converted to finished meat products.  Pilgrim then places the broiler meat products into the stream of commerce by sending them to distribution centers and transporting them to Pilgrim's customers.

53.     Plaintiffs are growers who entered into contracts with Pilgrim to raise broilers in its Lufkin, Texas Complex (the "Contracts").  Under these contracts, Plaintiffs were required to supply the land, buildings, equipment, utilities and labor to raise Pilgrim's broilers.  Plaintiffs were required to enter into large loans, in most cases in the hundreds of thousands of dollars, to construct the facilities required to raise Pilgrim's broilers.

54.     While the Contracts state that Plaintiffs are "independent contractors," and that the "work and labor herein provided for shall be done and performed by [Plaintiffs] and under its sole supervision, management, direction and control," in fact Plaintiffs have not had an independent contractor relationship with Pilgrim and Pilgrim, rather than Plaintiffs, has conducted the "supervision, management, direction and control" of broiler raising activities on Plaintiff's farms.  Further, although the Contracts state that Pilgrim shall "have no right at any time to direct or supervise [Plaintiff's] servants or employees in the performance of such work or as to the manner, means and methods in which such work or labor is performed other than to assure that the Broilers are raised in compliance with [Pilgrim] Grower Methods and Practices," in fact Pilgrim has, at all times, directed and supervised Plaintiff's servants and employees in the performance of such work and has controlled and directed the manner, means and methods in which such work is performed.  Pilgrim has accomplished this by sending supervisors, called "service technicians," and other Pilgrim employees and managers out to Plaintiff's farms to

direct the way in which Plaintiffs feed the broilers, the temperature Plaintiffs maintain in the broiler houses, the amount of light Plaintiffs supply in the broiler houses, the equipment Plaintiff's use in the broiler houses, the times during which Plaintiff's checked the broiler houses, the manner in which Plaintiff's dispose of dead broilers, the way in which Plaintiff's cool the broiler houses, and all other activities concerning Plaintiff's raising of broilers.   Pilgrim selects the "means" by which Plaintiff's do their work by designating the equipment to be used in the broiler houses; it selects the "manner" and "methods" by which Plaintiffs do their work by designating how Plaintiff's will conduct their day-to-day activities regarding the raising of birds. If Plaintiffs do not comply with Pilgrim's directives concerning the means, manner or method by which broilers are raised, the service technician will "write up" Plaintiffs on written logs and discipline Plaintiffs by (1) threatening to terminate Plaintiffs' contracts thus leaving Plaintiffs with hundreds of thousands of dollars of debt and no income, (2) actually terminating Plaintiffs contracts, (3) delivering inferior broiler chicks to Plaintiffs (which chicks are less healthy, have a higher die-off rate, and create a worse feed-to-weight conversion) and thereby pay Plaintiffs less, and (4) verbally insult and intimidate Plaintiffs.

55.     As part of its control of the means, manner and method of Plaintiff's activities, Pilgrim, in its contracts: (1) prohibits any visitors "to enter the poultry houses," (2) prohibits Plaintiffs from "visit[ing] other poultry farms," (3) requires that Plaintiffs "feed only feeds provided by [Pilgrim]," (4) requires that "no materials will be used to build or modify poultry houses that have not been approved by [Pilgrim]," (5) requires adherence to a detailed "Company's Broiler Grower Methods and Practices program," (6) gives itself the right to

"provide instructions and recommendations on the manner and conditions regarding the raising of the [b]roilers."  As the contracts state, adherence to these recommendations is not optional; they are requirements rather than recommendations.  The contract states: "[grower] must abide by the recommendations of the Pilgrims representatives."

56.     While both parties in an independent contractor relationship are permitted to make a profit, Plaintiffs are not permitted to make a profit.  Pilgrim has carefully set its contractual "fee" for mature birds so that, after deducting for labor, utilities and debt service, Plaintiffs have been reduced to making little or no profit to raise Pilgrim's broilers.  In effect, Pilgrim has set a minimal "salary" for Plaintiffs which falls below the minimum wage, and has garnered all of the profit involved in the raising of broilers for itself.

57.     Rather than providing Plaintiffs were contracts for a period of time, Pilgrim has maximized its control over Plaintiffs by making the contract ongoing until terminated by Pilgrim, similar to a typical employee-employer employment situation.  Pilgrim requires strict compliance with its orders and direction in the raising of its broilers for it to keep delivering broilers to Plaintiff's farms under the contracts, thus holding potential termination over Plaintiffs and continually threatening Plaintiffs with termination on a regular basis if Plaintiffs fail to comply with Pilgrim's orders and direction concerning activities on Plaintiffs' farms.

58.     The method through which Pilgrim pays Plaintiffs as growers is set forth in its contract.  Under that contract, Pilgrim represents as follows: "Each week the average feed conversion will be calculated for each [grower] selling that week.  An average feed conversion will be calculated for the week by dividing the total pounds of feed consumed by the total

Plaintiffs' Original Complaint

pounds of meat produced of all farms (excluding company employees) completely closed out each week (Sunday through Saturday)."   In fact, Pilgrim has not fairly paid Plaintiffs in this manner.  Rather than pay Plaintiffs under this formula, Pilgrim has continually required Plaintiffs to make unnecessary and unproductive modifications to their houses and equipment, and to absorb high utility bills necessitated by those unnecessary changes, so that after deductions for expenses, Plaintiffs are paid a minimal salary for raising Pilgrim's broilers.

59.     In addition, Pilgrim has engaged in a practice of favoritism under which certain growers, including many growers who have complied with demands to retrofit their farms by converting them to air conditioned "tunnel" farms, are given preferences and bonuses denied to Plaintiffs.   These preferences and bonuses include: (1) improperly and fraudulently ranking favored farms <u>higher</u> on the Grower Ranking Report used to determine payments and (2) improperly providing <u>superior</u> broiler chicks to preferred farms.   Conversely, Plaintiffs were improperly and fraudulently ranked <u>lower</u> on the Grower Ranking Report used to determine payments, and improperly given <u>inferior</u> broiler chicks and punishment for not complying with Pilgrim's recommendations.

60.     Pilgrim has abused the control that it exercises over Plaintiff's compensation.  In particular, Pilgrim has manipulated feed delivery, chick quality, pick up of chicks, delivery of chicks, unreasonable financial demands and other acts affecting compensation through a system of unfair punishments to Plaintiffs.  Pilgrim purports to pay Plaintiffs on a "Grower Settlement Basis" set forth in the contracts, but in fact, Pilgrim is secretive regarding the basis for Plaintiff's pay.  Through manipulation of the ranking, feeding and weighing systems it controls and does

Plaintiffs' Original Complaint

not reveal to Plaintiffs, Pilgrim pays Plaintiffs arbitrarily and not consistent with its contracts. Plaintiffs' lack of control over Pilgrim's data inputs into its ranking system, combined with Plaintiffs' inability to obtain information regarding those inputs, constitutes and unfair, unjustly discriminatory, and deceptive device.

61.     Under Pilgrim's system of secrecy regarding payment data and, it pays certain growers on a more favorable basis than Plaintiffs.  Pilgrim withholds and does not disclose to Plaintiffs these more favorable contracts.   Plaintiffs were not offered an opportunity to receive pay on the same basis as these preferred contracts.  Failure to allow Plaintiffs this opportunity is preferential, unfair, and unjustly discriminatory.

62.     Pilgrim has breached its Contracts with Plaintiffs by unilaterally amending those contracts without consideration to Plaintiffs.  Pilgrim has further breached its contracts with Plaintiffs by requiring them to execute new less favorable contracts while it maintained valid contracts with Plaintiffs.  While the contract states that it can be terminated upon fourteen days' notice by Pilgrim, Pilgrim has maintained the contracts with Plaintiffs and required them to enter into amended and new contracts without such notice.

63.     Pilgrim required Plaintiffs to invest substantial proceeds into their farms for the benefit of Pilgrim but not Plaintiffs and not consistent with the Contracts.  Simultaneously, Pilgrim stripped from Plaintiffs all control and influence over the operation of their farms, including the day to day operating conditions of the rams and the manner of the grow-out of the broilers.  Under the guise of "upgrades" and in violation of the Contracts, Pilgrim intentionally forced Plaintiffs into substantial and unnecessary debt in order to (1) increase the monitoring and

Plaintiffs' Original Complaint

control of Pilgrim and subservience of Plaintiffs to Pilgrim's demands, and (2) increase the profits of Pilgrim to the detriment and loss of Plaintiffs.

64.     Pilgrim uses a "tournament system" of pay for Plaintiffs.  All growers who have chickens processed at Pilgrim's Lufkin complex in a particular week are compared with one another.  Allegedly, depending upon certain performance variables such as grower cost and feed conversion, a grower will be paid more per pound than the Pilgrim set base price or less per pound than the base price.  For Pilgrim, this system balances out so that Pilgrim pays the same each week for its chickens because it deducts pay from the allegedly less efficient performing farms and adds pay to the allegedly more efficient farms.

65.     This system has, however, been fraudulently manipulated by Pilgrim such that it arbitrarily alters the input variables to show certain preferred farms as higher on the tournament ranking and other un-preferred and punished farms as lower on the tournament ranking system. Under Pilgrim's system of manipulation, if a grower is being punished, he will receive inferior chicks and through other manipulations, be cast down low on the ranking, receiving less pay; conversely, if a grower has abided by Pilgrim's demands – by, for instance, agreeing to convert his poultry houses to "tunnel" farms – he will be rewarded by being fraudulently and artificially raised to one of the top spots on the ranking system.  Despite the fact that the grower's practices for raising chickens and all other relevant variables remain constant, Pilgrim rewards and punishes growers through artificially, secretly and fraudulently manipulating the ranking system used to calculate grower pay.  Plaintiffs have been harmed by this fraudulent practice.

Plaintiffs' Original Complaint

66.     In addition, Pilgrim and Bo Pilgrim have conspired to improperly prefer certain growers over Plaintiffs by providing those preferred growers with a better rate of pay.    In addition to the Plaintiff farms, Pilgrim and Bo Pilgrim also raise chickens on farms owned by Pilgrim's CEO, Bo Pilgrim, and other Pilgrim's insiders.

67.     The January 2002 Proxy Statement sent to Pilgrim's shareholders stated as follows:

> Since 1985, Lonnie "Bo" Pilgrim has engaged in chicken grow-out operations with the Company, which involves the purchase of chicks, feed and veterinary and technical services from the Company and the growing out of chickens to maturity at which time the Company purchases them.  ***Chicks, feed and services are purchased from the Company for their fair market value, and the Company purchases the mature chickens from Mr. Pilgrim at market-quoted prices at the time of purchase.  Management of the Company believes that this operation is conducted on terms not less favorable to the Company than those that could be arranged with unaffiliated persons.***  During fiscal year 2001, the Company paid Mr. Pilgrim, doing business as Pilgrim Poultry G.P. ("PPGP"), $39,784,000 for chickens produced in his grow-out operations, and PPGP paid the Company $38,771,000 for chicks, feed and services. Lonnie "Bo" Pilgrim is the sole proprietor of PPGP.  (***emphasis added***).

68.     This system of using Plaintiffs to increase the profits of Pilgrim to the loss and detriment of Plaintiffs, while not requiring the same detriments and losses of insiders constitutes a deceptive, unfair and fraudulent practice.  The Settlement sheets between Pilgrim and its CEO, Bo Pilgrim, as well as the grower contract between Pilgrim and Bo Pilgrim's farm, "LTD Farm," confirm the nature of this practice.  According to those documents, Pilgrim uses a different and much more favorable formula to determine compensation to Bo Pilgrim than the

Plaintiffs' Original Complaint

formula used by Pilgrim to determine the compensation of Plaintiffs under its manipulated tournament system.

69.     Unlike Plaintiffs, for numerous years, Bo Pilgrim's "LTD Farm" contract has allowed him to purchase chicks and feed during the grow-out of a broiler flock.   Under this arrangement, Bo Pilgrim was paid by Pilgrim the quoted weekly "Georgia Dock Price" ("GDP") for a dressed boiler, less than 14.5 cents per pound for processing, hauling and catching costs.   Bo Pilgrim was paid the GDP, less than 14.5 cents per pound, times 73 percent of the total live weight of his boilers (in other words (GDP minus 14.5 cents) times 0.73 times live weight of broilers).   The weight used in this calculation was reduced to 73 percent because the GDP is generally used for transactions involving dressed birds and Bo Pilgrim's broilers were weighted live.   This system of pay is far preferable to the manipulated tournament system employed for Plaintiffs.   Even assuming that Bo Pilgrim's payments are capped at an alleged ceiling of 102 percent of costs, under his pay formula, he is reimbursed all of his costs for feed and chicks, plus an additional 2 percent of those costs.   In addition, under this formula, Bo Pilgrim is paid an additional bonus using a modified tournament system, plus an additional 2 percent on top of the modified tournament pay.   The modified tournament system of pay used for Bo Pilgrim employs a different method of determining the bonus than that employed for Plaintiffs, thus assuring that Bo Pilgrim receives a larger bonus (less of a pay reduction) than Plaintiffs.

70.     In addition, other Pilgrim insiders have received preferential pay and treatment. This practice of paying Bo Pilgrim and other insiders more for broilers than Plaintiffs are paid for theirs constitutes and illegal preference by Pilgrim.

71.     Pilgrim has completely dominated and controlled the activities, means and farming practices of Plaintiffs.  Despite the fact that Plaintiffs have collectively been required to invest millions of dollars into their farms to benefit the profit margin of Pilgrim, and have therefore been placed in a position of severe and large financial risk to Pilgrim, Pilgrim has continually controlled all aspects of Plaintiffs' ability to be compensated.  Pilgrim controls the input of chicks and the input of feed that allegedly determine Plaintiffs' pay.

72.     Pilgrim has restricted Plaintiffs from receiving information that would have provided assistance to Plaintiffs in their business decisions, and Pilgrim has prohibited management steps that would have aided them in their businesses.  Pilgrim has unilaterally dictated the timing, amount, breeds, and quality of chicks provided to Plaintiffs.  Pilgrim has determined the weight of Plaintiffs' broilers, refusing to allow Plaintiffs to weigh the broilers to check Pilgrim's figures and refusing to allow Plaintiffs to monitor the weighing process.  In essence, Pilgrim secretly, unilaterally and without reporting, sets all of the variables that determine Plaintiffs' pay.  For all intents and purposes, Plaintiffs have no control over the amount of their pay.  Despite Plaintiffs requests, Pilgrim has continually refused their requests regarding the data used for their compensation, including requests for hatchery location, flock number, age of the pullet birds provided, breed and type of the parents of the chicks, disease and illness data for the parent birds, disease and illness data for the chicks, and other information

Plaintiffs' Original Complaint

that would have assisted Plaintiffs in managing the growth of broilers, monitoring chick quality, and checking the secretive and unilateral designation of compensation by Pilgrim for each flock.

73.     Further, Pilgrim has refused Plaintiffs' requests to conduct any independent testing of chicks, even in cases where it seems that an unusually high percentage of diseased or poor quality chicks were delivered to Plaintiffs by Pilgrims.  This allows Pilgrim to punish Plaintiffs with poor feed conversion rates, rather than allocating the loss to Pilgrim, the party who caused it by delivering diseased and poor quality chicks to Plaintiffs.  In essence, despite Plaintiffs' best efforts to effectively grow healthy flocks, Pilgrim places all of the loss and risk due to chick disease, poor chick quality and poor feed quality onto Plaintiffs although it is Pilgrim and not Plaintiffs who control those variables.   In response to their inquiries regarding this data and the determinants of this data, Plaintiffs have been continually informed by Pilgrim that they must rely upon the statements and opinions of Pilgrim and its service technicians, who are not qualified in the area of chick health and quality.  Plaintiffs have been prevented from allowing veterinarians examine the broilers or having labs examine the content of the growth hormone enhanced feed they are provided.  This practice and the other improper practices set forth herein prevent Plaintiffs from being able to control their earnings or make a profit.

74.     Pilgrim's control of Plaintiffs and the growth process of broilers extends to all aspects of their relationship.  Pilgrim has unilateral control over the type, quality and quantity of feed provided to Plaintiffs, and the type, quality and quantity of chicks provided to Plaintiffs. Pilgrim has unilateral control over the timing of delivery of feed, the timing of delivery of chicks, and the timing of picking up mature birds.  Despite its refusals to permit Plaintiffs to

Plaintiffs' Original Complaint

check or monitor the process, Pilgrim has required Plaintiffs to accept the delivered feed, even when Plaintiffs have complained that even on a visual basis, the feed is of poor quality. Because Pilgrim arbitrarily and unilaterally determines when feed is delivered, Plaintiffs have run out of feed due to Pilgrim's failure, delay and negligence in properly delivering feed.

75.     To serve its own purposes, Pilgrim has systematically refused to provide Plaintiffs with basic data regarding their farming operations.  Pilgrim has arbitrarily and improperly failed to provide Plaintiffs with computer generated tickets showing feed weights.  Pilgrim has arbitrarily and improperly refused to provide the basic feed ingredients to Plaintiffs or allow then to perform independent testing on the feed.  Pilgrim has not allowed Plaintiffs to verify feed delivery weights or maintain independent scales for weight verification.  Pilgrim has, instead, required Plaintiffs to blindly accept the feed weight figures provided Pilgrim. Withholding this information and blocking Plaintiffs' attempts to gain this data has impaired Plaintiffs' ability to control their farms, monitor their farms and make a profit.

76.     Pilgrim has used the quality of chicks delivered to Plaintiffs as an improper system of punishments and inducements.  Pilgrim has, in retaliation and for purposes of punishment, delivered dead, diseased and poor quality chicks to Plaintiffs.  It is accepted within the poultry industry that chick mortality within three to seven days of delivery is more often than not a reflection of very poor chick quality and hatchery management, rather than any action or inaction by the broiler grower.  In addition, in many cases, broilers who die after seven days often die because they are of an inferior, weak and/or diseased chick type, rather than any action or inaction by the grower.  Pilgrim has acknowledged that it has numerous breed types of chicks

Plaintiffs' Original Complaint

within its hatcheries, and that this is by design.  It has acknowledged that the broilers bred for faster development of breast meat have an increased mortality rate toward the end of the grow-out period.  Further, when Pilgrim rejects broilers that are damaged or killed by Pilgrim chicken catchers, Plaintiffs are often left to dispose of the rejected birds and carcasses.  Pilgrim has attempted to unilaterally and improperly shift the environmental risk of poultry farming to Plaintiffs despite the fact that Pilgrim and not Plaintiffs create, control and determine that risk.

77.      Pilgrim has failed to provide information to Plaintiffs or allow Plaintiffs access to management and other information.  This refusal to allow Plaintiffs to access basic information regarding farming operations on their own land violates the Contracts and has damaged Plaintiffs.

78.      Pilgrim's complete domination and control of the means of production, information, discipline and pay for Plaintiffs creates an unfair and asymmetric relationship between the parties.  Pilgrim retains superior power over information, the flow of revenues and expenses, and all aspects of the relationship, creating an unfair economic advantage for Pilgrim. This practice by Pilgrim has led to the destruction of an otherwise open, transparent and competitive economic market. Specifically, Pilgrim has created an economic environment in which it (a) pays Plaintiffs and other growers without any checks and balances for accuracy or truthfulness, (b) delivers sub-standard inputs of chicks and feed to Plaintiffs and other growers, (c) undue economic pressure to Plaintiffs or other growers, (d) places undue economic costs and burdens on Plaintiffs and other growers, (e) shifts undesired economic risks and burdens from itself to Plaintiffs and other growers, (f) shifts the ability to make a profit from Plaintiffs and

Plaintiffs' Original Complaint

other growers to itself, (g) controls and chills any and all criticism of its operations and actions through the threat of termination and poor chick quality, (h) prevents any and all information regarding its operations, actions and variables for pay through the threat of termination and poor chick quality, (i) manipulates the quality of chicks, quality of feed, amount of feed and payment data as a means of fraudulently raising or lowering Plaintiffs' pay, and (j) provides preferential treatment and pay to Pilgrim's insiders to the detriment of Plaintiffs and other growers.

79.    Through these devices and unilateral controls, Pilgrim has created a market in which the growers, including Plaintiffs, lack the market power, information or freedom from high debt necessary to bargain with Pilgrim at arm's length.   Pilgrim has systematically exploited the economic power it has gained from consolidation in the poultry industry, to the detriment of Plaintiffs and other growers.   This consolidation, combined with the asymmetric relationship between Pilgrim and Plaintiffs as growers is demonstrated by Pilgrim's steadfast and insolent refusal to engage in basic management practices and provision of information that would be expected for the benefit of growers.   This exploitation is also demonstrated by the further practices enumerated above, and by the preferential treatment provided by Pilgrim to Bo Pilgrim and other insiders.

80.    Pilgrim's and Tyson Foods, Inc. ("Tysons") are the only integrators in Northeast Texas that could compete for the services of Plaintiffs and other Northeast Texas growers. Tyson's operations are sub-divided into complexes and operate similar to the complexes of Pilgrim.   Tyson purposefully pays its growers using a tournament system of pay similar to that of Pilgrim.

81.     The feed that is necessary for raising broilers in Northeast Texas is hauled by trucks from Pilgrim and Tyson's feed mills to the farms of Plaintiffs and other area growers. Transportation of feed is costly and time consuming for the integrators.  As a result, Pilgrim and Tyson require growers who raise broilers for a particular complex to be located within a limited geographic area surrounding a feed mill in that complex.  In Pilgrim's case, it requires its growers to be located within fifty miles of a feed mill.  The geographic area from which Pilgrim or Tyson will hire growers for a particular complex is limited by their transportation costs and is known as the "Captive Draw Area" for that complex.

82.     Pilgrim's Lufkin, Texas Complex ("Pilgrim Lufkin Complex") has a Captive Draw Area that significantly overlaps with Tyson's Carthage, Texas Complex and Tyson's Center, Texas Complex.

83.     Pilgrim and Tyson are the nation's two largest integrators.  Because they compete against each other in the same towns and communities, and because they are the only competitors in those towns and communities, one would assume that there would be strong and healthy competition for the services of Plaintiffs and other top growers in the Lufkin Complex area.  Instead, there is virtually no competition for the services of growers in the area between Pilgrim and Tyson.  Once growers, including Plaintiffs, begin growing for one of the two integrators, they have little or no opportunity to "switch" to the other grower.  Through a cooperative arrangement, except in very rare circumstances, Tyson refuses to extend contracts to former Pilgrim growers and Pilgrim refuses to extend contracts to former Tyson growers despite the quality of their farms, their expertise or their farming operations.  Pilgrim and Tyson

Plaintiffs' Original Complaint

have created a Northeast Texas economic environment in which competition is utterly lacking for grower services.

84.     Because of this economic environment by Pilgrim, Pilgrim enjoys the economic benefits that come from being a total "monopsonist" for the purchase of grower services.  A "monopsonist" is the mirror image a monopolist; while a monopolist is a seller that can exercise market power over buyers, a monopsonist is a buyer that can exercise economic market control over sellers.  Pilgrim retains the power and employs the power to provide artificially low levels of compensation to Plaintiffs and other growers with the comfort of knowing that another company will not attempt to hire Plaintiffs or those other growers away.  Plaintiff is able to use its monopsony power to force Plaintiffs and other growers into choosing one of two economically devastating actions: sign the Contracts with all of their unfair and unreasonable terms and unilateral controls and amendments intended to force Plaintiffs deeper into debt and farther away from the possibility of a profit, or cease receiving chicks and go out of business with huge, unpayable debt service.  Either option threatens Plaintiffs with a complete absence of economic control, high debt, loss of economic security, foreclosure and bankruptcy, all within the sole control of Pilgrim.  Plaintiffs do not have the third option of growing for Tyson.  As a result of this economic squeeze play by Pilgrim, Plaintiffs have received compensation materially lower than what they would have received but for the lack of competition for grower services.  Plaintiffs have, when inquiring of Tyson regarding the possibility of growing for Tyson, been told that they would not be hired by Tyson.  In addition, Scott Magee, Pilgrim's manager responsible for hiring new growers in Pilgrim's Lufkin, Texas Complex, as stated

under oath that he could not remember any Tyson growers who had switched to Pilgrim during the time he had been responsible for hiring new grower.  He further stated under oath that he could not remember any Pilgrim grower who had switched to Tyson during that time period. He further stated under oath that if a current Tyson grower contacted him and wanted to grow broilers for Pilgrim, he would not send the Tyson grower an application.  From 1998 to the present, few if any Pilgrim growers have switched to Tyson.  During this period, few Pilgrim growers who were not insiders have been permitted to switch from Tyson to Pilgrim.

85.     Pilgrim has been able to stabilize and unilaterally control grower compensation, including Plaintiffs' compensation, because there is no competition for growers' services in the relevant market.  As a result, Plaintiffs have received compensation materially lower than what would have prevailed in a competitive market absent Pilgrim's wrongful conduct.

## VI.

## CAUSES OF ACTION

**A.     Count I -          FLSA Violations: Plaintiffs are Employees Not Independent Contractors**

86.     Plaintiffs repeat the allegations of each and every paragraph set forth above.

87.     Under the Fair Labor Standards Act, 29 U.S.C. 201-209 ("FLSA"), an employer may not designate an employee as an "independent contractor" if in fact, the employee does not meet the legal requirements of an independent contractor.  In particular, under the FLSA, an individual is an "employee" for purposes of wage, overtime, and FLSA penalties if the employer controls the means, manner and method of the employee's work.  Further, an

individual is not an  "independent contractor" relationship with an employer if the employer deprives him of the opportunity to make a fair profit.  Plaintiffs are covered by the FLSA because they are engaged in commerce and engaged in the production of goods for commerce (namely the production of consumable broiler chickens) or employed in an enterprise engaged in commerce or the production of goods for commerce.  In addition, Plaintiffs are covered under the FLSA based upon the activity of their employer, Pilgrim, which conducts an enterprise engaged in commerce or in the production of goods for commerce.  No exemption from FLSA coverage applies to either Pilgrim or Plaintiffs.

88.    Although Pilgrim designates Plaintiffs as "independent contractor[s]" in its contracts with Plaintiffs, this contractual designation is not dispositive of Plaintiffs' status because (1) this contract is a "sham" under the FLSA, (2) as set forth above, there is extrinsic evidence showing that the contract is a "sham" regarding Pilgrim's control of Plaintiffs, (3) as set forth above, there is extrinsic evidence that Pilgrim, the hiring party, has actually controlled Plaintiffs in a manner inconsistent with the contractual provisions, and/or (4) Plaintiffs' contracts have been modified by a subsequent express or implied agreement permitting Pilgrim to control Plaintiffs as employees.  Pilgrim does not occasionally or sporadically control Plaintiffs as employees, but rather does so on a planned, regular and consistent basis.

89.    Pilgrim has regularly and consistently treated Plaintiffs, through actual control, as employees under the FLSA through the specific actions set forth above.  These actions demonstrate that: (1) the actual extent of Pilgrim's control over the details of work rather than just the final results of that work are consistent with an employer-employee relationship, (2) the

actual control by Pilgrim over Plaintiffs is consistent with an employer-employee relationship, (3) the kind of occupation involved – the raising of broilers – being the type typically permitting the farmer to act without employer supervision indicates an employer-employee relationship, (4) whether Plaintiffs are engaged in a "distinct occupation" or business in their relationship with Pilgrim indicates and employer-employee relationship, (5) the skill required of Plaintiffs in their dealings with Pilgrim indicates an employer-employee relationship, (6) whether Plaintiffs are permitted to in fact operate stand-alone, independent and sustainable businesses without Pilgrim indicates an employer-employee relationship, (7) the fact of Pilgrim's integration of Plaintiffs' work into its business indicates an employer-employee relationship, (8) Pilgrim's asserted and threatened right to discharge Plaintiffs indicates an employer-employee relationship, (9) Plaintiffs' inability to in fact receive a profit through their relationship with Pilgrim indicates an employer-employee relationship, (10) the length of time and permanency of Plaintiffs' work for Pilgrim indicates an employer-employee relationship, (11) the fact that Plaintiffs cannot determine the instrumentalities of work such as the poultry house design, feeding equipment, ventilation, temperature, feed, supplies, materials and place of work indicates an employer-employee relationship, (12) the fact that payment is made not by the job but on a formula controlled and dictated by Pilgrim and its delivery of feed and chicks indicates an employer-employee relationship, (13) the fact that Pilgrim does not in fact believe it is operating under an arms' length independent contractor relationship indicates an employer-employee relationship, (14) the fact that any contingency aspect of Plaintiffs' pay – rather than a Pilgrim's set payment schedule – is a sham, indicates an employer-employee relationship, and

Plaintiffs' Original Complaint

(15) the fact that Pilgrim has usurped and dominated all opportunity for professional judgment by Plaintiff in the raising of broilers indicates an employee relationship.  In essence, each and every factor used by federal and state courts to determine independent contractor/employee status supports a factual finding that Plaintiffs are and have been employees of Pilgrim.

90.     Under these tests and standards of the FLSA and applicable case law, Plaintiffs are and have been "employees" of Pilgrim with respect to the raising of Pilgrim's broilers.  As set forth above, Pilgrim completely and to detail controls the means, manner and method of Plaintiffs' work, specifying the equipment, manner of raising broilers and conditions of work. Pilgrim disciplines and rewards Plaintiffs as employees and threatens them with termination as an employer does.  Pilgrim takes for itself, through its payment formula, all profit margin from poultry broiler operations.

91.     Plaintiffs seek a declaration that they have been employees of Pilgrim under the FLSA during the period in which they have raised broilers for Pilgrim, and seek all wages, back wages, overtime and penalties available under the FLSA in light of their employee status.

**B.     Count II -      Fraud**

92.     Plaintiffs repeat the allegations of each and every paragraph set forth above.

93.     Pilgrim has engaged in a series of fraudulent representations and non-disclosures to Plaintiffs.  Specifically, Pilgrim has represented to Plaintiffs that all growers in the Lufkin Complex are treated similarly and ranked similarly for purposes of compensation.  This representation is false, known to be false, material, and relied upon by Plaintiffs to their detriment.  Further, Pilgrim has fraudulently failed to disclose to Plaintiffs that it has provided

Plaintiffs' Original Complaint

much more favorable terms, chicks, feed, benefits and pay to certain preferred growers, including Bo Pilgrim and his farm LTD Farm, and provided to Plaintiffs inferior terms, benefits, chicks, feed, benefits and pay.  Pilgrim is liable to Plaintiffs for damages resulting from these fraudulent practices.

94.     In addition, in connection with and in furtherance of the plan to have an unfair and secret multi-tiered grower system in which the vast majority of growers, including Plaintiffs, receive inferior products, benefits, contracts and pay, Pilgrim falsely and fraudulently misrepresented to Plaintiffs the truthful ranking of all relevant farms by falsely and fraudulently failing to include all relevant farms with appropriate deductions for Pilgrim expenses and additions for bonuses paid to preferred growers.  Further, Pilgrim falsely and fraudulently misrepresented to Plaintiffs the truthful ranking of all farms, including farms owned by insiders such as Bo Pilgrim.  Pilgrim is liable to Plaintiffs for damages resulting from these fraudulent practices.     Plaintiffs would show that they are entitled to damages that occurred more than four years prior to the filing of this action because Plaintiffs did not know or, exercising reasonable diligence, could not have known that the Pilgrim/Bo Pilgrim/LTD Farm pay formula was preferential and fraudulent, or that the feed conversion ranking system and feed and chick delivery system was fraudulent as alleged above.  As such, the discovery rule allows damages to be recovered for acts prior to 2003.

## C.    Count III -    Deceptive Trade Practice Violations – Deception and Preferential Treatment

95.     Plaintiffs repeat the allegations of each and every paragraph set forth above.

96.     Pilgrim is a packer and live poultry dealer.  Plaintiffs are poultry farmers who have entered into broiler growing arrangements with Pilgrim.

97.     The method and manner of compensation paid to Bo Pilgrim, as described above, is different and preferential vis-à-vis the method and manner of compensation paid to Plaintiffs. Pilgrim never informed Plaintiffs or made them aware of this preferential arrangement between Pilgrim and Bo Pilgrim.  Plaintiffs had no knowledge that Bo Pilgrim's LTD Farm was paid in the manner it was paid or that the arrangement was preferential to their method of compensation until the time of the filing of this suit.  Pilgrim fraudulently and purposefully failed to inform Plaintiffs of these facts, upon which this cause of action is based.  Pilgrim never offered to Plaintiffs and arrangement that was the same or similar to the arrangement offered and provided to Bo Pilgrim.  There is no reasonable basis for Pilgrim's refusal to provide to Plaintiffs an equivalent pay formula, or use for Plaintiffs an equivalent pay formula.

98.     Pilgrim's failure to provide Plaintiffs with the Bo Pilgrim/LTD Farm formula as an option, or an equivalent formula value in pay, is an undue and/or unreasonable preference or advantage in favor of Bo Pilgrim, and is unfair and unjustly discriminatory as the purported differences in the risks and the growing arrangement between Bo Pilgrim and Plaintiffs does not justify the difference in pay.  As a result, such conduct by Pilgrim and Bo Pilgrim (through LTD Farm) is a violation of the Deceptive Trade Practices Act, Business & Commerce Code Section 17.50 *et seq.*  (the "Act").

99.     Plaintiffs are consumers as that term is defined in Business & Commerce Code Section 17.45(a).

Plaintiffs' Original Complaint

100.    Pilgrim and Bo Pilgrim have engaged in acts of misconduct that qualify as false, misleading or deceptive acts or practices under Sections 17.50(a) and 17.46(b) of the Act. In particular, Plaintiffs detrimentally relied upon the actions and misrepresentations of Pilgrim and Bo Pilgrim set forth below and such actions and misrepresentations were unconscionable, as that term is defined in the Act.

101.    The false, misleading and deceptive practices of Pilgrim and Bo Pilgrim in violation of Sections 17.50(a) and 17.46(b).   As set forth in the factual allegations above, Pilgrim and Bo Pilgrim

(a)     represented that goods, chicks and feed, had sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they did not have (in violation of Section 17.46(b)(5));

(b)     represented that deteriorated chicks were new and in proper condition for placement on Plaintiffs' farms when they were not (in violation of Section 17.46(b)(6));

(c)     falsely represented that goods or services (including feed, feed delivery, chicks, chick delivery, weighing services and feed conversion ranking services) were of a particular standard, quality, or grade (including that they were not chemically altered with growth hormones or ingredients harmful to young or mature birds), or that goods (feed and chicks) were of a particular style, genetic type and health (in violation of Section 17.46(b)(7));

(d)     disparaging the goods, services, or businesses of Plaintiffs by false or misleading representations of facts (including falsely and in a misleading fashion blaming Plaintiffs

Plaintiffs' Original Complaint

for low feed conversion rankings when in fact Pilgrim manipulates such ranking to falsely rank Plaintiffs and fraudulently punish or reward growers, and including disparaging the chicken growing services, businesses and business acumen of Plaintiffs as a pretext for improper preferences for insiders) (in violation of Section 17.46(b)(8));

(e)     representing that an agreement confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law (including representations regarding the right to prohibit growers from communicating with one another or visiting each others' farms and representations that Pilgrim's has the right to force Plaintiffs to retrofit their farms to continue existing contractual rights, and erroneous interpretations of contractual rights related to threats intended to increase Plaintiffs' expenditures for Pilgrim's sole benefit) (in violation of Section 17.46(b)(12));

(f)     knowingly making false or misleading statements of fact concerning the need for replacement of poultry house equipment and ventilation (in violation of Section 17.46(b)(13));

(g)     failing to disclose information concerning goods or services that was known at the time of the transaction if the failure to disclose was intended to induce the consumer into a transaction the consumer would bot have entered into had the information been disclosed (including the un-profitability of grower arrangements when Pilgrim forces costly expenditures for retrofitting and changing the equipment within the house; including the failure of Pilgrim's to meet the number of chick deliveries used for its calculation of revenues when such expenditures are projected to lending institutions; including

Plaintiffs' Original Complaint

Pilgrim's fraudulent and secretive manipulations of feed conversion data as the basis for grower pay; including the disparate arrangements for pay used for Bo Pilgrim farms as compared with Plaintiffs' farms; including the use of good and bad chick quality as a system of rewards and punishments for growers) (in violation of Section 17.46(b)(24)).

102.    Pilgrim and Bo Pilgrim engaged in these acts with knowledge of the falsity and with the intent to deceive Plaintiffs.  Plaintiffs relied upon these representations and actions and such reliance was a substantial factor in inducing Plaintiffs into growing broilers with Pilgrim and continuing to expend funds for Pilgrim.

103.    Pilgrim breached express and implied warranties, under Section 17.50(a)(2) by delivering to Plaintiffs inferior chicks, inferior feed and false feed conversion rankings. Plaintiffs were damaged by these breaches of express and implied warranties related to their contracts with Pilgrim.

104.    The violations set forth above were a direct, actual, and producing cause of damages suffered by Plaintiffs.

105.    Pilgrim is currently engaging in intimidation and harassment of Plaintiffs regarding their contracts and contractual rights, as well as their right not to be subject to deceptive actions in violation of the Act.  Pilgrim is also engaged in a blanket and wholesale attempt to force the illicit waiver of rights protected by the Act.  Therefore, Plaintiffs will file their notices under the Act after the filing of this Action to preserve, as best possible in the time available, the status quo.

106.    Plaintiffs hereby seek monetary damages and mental anguish damages from Pilgrim and Bo Pilgrim (including damages from the inception of the preferential pay provided to Bo Pilgrim (the Georgia Dock formula and/or the 102% rule)) until trial for these violations. Plaintiffs also seek attorney fees in the amount the jury determines to be fair and just.

107.    Plaintiffs would show that they are entitled to damages that occurred more than four years prior to the filing of this action because Plaintiffs did not know or, exercising reasonable diligence, could not have known that the Bo Pilgrim/LTD Farm pay formula was preferential or that Pilgrim and Bo Pilgrim were engaged in the system of deceptive acts alleged above.  As such, the discovery rule allows damages to be recovered for acts prior to 2003.

**D.    Count IV -    Fraud, Fraudulent Non-Disclosure and Conspiracy by Bo Pilgrim**

108.    Plaintiffs repeat the allegations of each and every paragraph set forth above.

109.    Pilgrim and Bo Pilgrim have acted together and in concert to commit the violations of the Deceptive Trade Practices Act set forth above.  As such, Pilgrim and Bo Pilgrim and jointly and severally liable as co-conspirators for such violations of the Deceptive Trade Practices Act.

110.    In addition, Pilgrim and Bo Pilgrim have acted together and in concert to achieve an improper purpose, namely the fraudulent practice of providing more favorable terms, chicks, feed, benefits and pay to certain preferred growers, including Bo Pilgrim and his farm LTD Farm, and inferior terms, benefits, chicks, feed, benefits and pay to Plaintiffs, non-preferred growers.  As such, Pilgrim and Bo Pilgrim and jointly and severally liable as co-conspirators for such fraudulent practices.

111.    In addition, in connection with and in furtherance of the plan to have an unfair and secret multi-tiered grower system in which the vast majority of growers, including Plaintiffs, receive inferior products, benefits, contracts and pay, Pilgrim and Bo Pilgrim falsely and fraudulently misrepresented to Plaintiffs the truthful ranking of all relevant farms by falsely and fraudulently failing to include all relevant farms with appropriate deductions for Pilgrim expenses and additions for bonuses paid to preferred growers.  Further, Pilgrim and Bo Pilgrim falsely and fraudulently misrepresented to Plaintiffs the truthful ranking of all farms, including famers owned by insiders such as Bo Pilgrim.  Pilgrim and Bo Pilgrim are jointly and severally liable as co-conspirators for such fraudulent practices.

112.    In addition, Plaintiff Lovell has been defrauded through misrepresentations and fraud by Pilgrim regarding the economic viability and benefit to him for the "tunnel" retrofitting of his poultry houses.   In fact, such retrofitting benefits only Pilgrim and is an economic detriment to growers.  Pilgrim has intentionally provided false financial information regarding revenues, expenses and risks of retrofit tunnel farm operation.  Plaintiff Lovell has relied upon these misrepresentations to his detriment and damage.

**E.    Count V -      Breach of Contract**

113.    Plaintiffs repeat the allegations of each and every paragraph set forth above.

114.    Pilgrim has materially breached its Contracts with Plaintiffs.   In particular, Pilgrim has breached paragraph 1 of the Contracts, stating: "The work and labor herein provided for shall be done and performed by Independent Contractor as an independent contractor and under its sole supervision, management, direction and control.  The Company

shall have no right at any time to direct or supervise Independent Contractor's servants or employees in the performance of such work or as to the manner, means and methods in which such work or labor is performed other than to assure that the Broilers are raised in compliance with the Attachment "B" Grower Methods and Practices."

115.    Pilgrim breached this material provision of the Contracts by directing and supervising Plaintiffs and their servants in the performance of work on Plaintiffs' farms. Plaintiffs have been damaged by this breach.

116.    Pilgrim further breached this material provision of the Contracts by dictating the manner, means and methods in which such work was performed.  Plaintiffs have been damaged by this breach.

117.    Pilgrim further breached this material provision of the Contract by falsely designating Plaintiffs as independent contractors rather than employees, and by garnering for itself all profits, control and benefits of an employer/employee relationship while failing to pay Plaintiffs as employees or comply with federal law regarding withholding and payments to Plaintiffs, by falsely designating Plaintiffs as independent contractors.

118.    Pilgrim further breached this material provision of the Contract by exceeding the scope of supervision and control within the Grower Methods and Practices provisions as reasonably interpreted.  Plaintiffs have been damaged by this breach.

119.    Pilgrim materially breached paragraph 2 of the Contracts.   This provision sets forth the basis upon which Plaintiffs were to be paid under the Contracts as follows:

(a)     Each week the average feed con version will be calculated for each [Grower] selling that week.  An average feed conversion will be calculated for the week by dividing the total pounds of feed consumed by the total pounds of meat produced of all farms (excluding company employees) completely closed out each week (Sunday through Saturday).  . . .

120.    In contravention of this payment formula, as set forth above, Pilgrim manipulated the tournament ranking system for Plaintiffs and other growers for its own fraudulent purposes. In particular, Pilgrim elevated certain growers over Plaintiffs and lowered Plaintiffs on the ranking for arbitrary reasons in violation of this payment provision.  Plaintiffs have been damaged by this breach.

121.    In contravention of this payment formula, as set forth above, Pilgrim excluded insiders such as Bo Pilgrim from the ranking system and thereby decreased Plaintiffs' pay and the pay of other growers.  Plaintiffs have been damaged by this breach.

122.    In contravention of this payment formula, Pilgrim failed to adjust the ranking to reflect the true "cost" for raising broilers by failing to allocate or take account for additional costs on Plaintiffs' farms that Pilgrim required, thereby decreasing Plaintiffs' pay.  Plaintiffs have been damaged by this breach.

123.    In contravention of this payment formula, Pilgrim ranked "tunnel" and "conventional" poultry farms together, thereby falsely reflecting the true ranking and feed conversion of the farms by failing to take account for bonuses and additional costs associated with the differences between those houses.  Plaintiffs have been damaged by this breach.

Plaintiffs' Original Complaint

124.    Pilgrim further breached this paragraph of the Contracts by requiring more than ordinary operating "expenses" (as that term is used in paragraph 8) to be paid by Plaintiffs, and requiring that Plaintiffs deduct such extra-ordinary costs, such as the cost of tunneling, retrofitting, and making large scale additions to the poultry houses, from the "fee" paid to Plaintiffs.  No provision of the Contracts permits Pilgrim to force these costs on Plaintiffs and force the fee to be reduced by such costs and the manipulation of expenses by Pilgrim in this manner is a material breach of the Contracts.  Plaintiffs have been damaged by this breach.

125.    Pilgrim materially breached paragraph 3 of the agreement regarding termination. Pilgrim has threatened Plaintiffs, in writing and verbally, by stating that if Plaintiffs did not exceed to Pilgrim's extra-contractual demands, such as expending hundreds of thousands of dollars to retrofit their poultry houses, or following the extra-contractual controls over the manner, means and method of work, Pilgrim would cease delivering chickens and terminate the agreements.  Under the Contracts, Pilgrim cannot breach the Contracts and then require that Plaintiffs must agree to accept those breaches or it will terminate Plaintiffs' contractual rights. This series of threats, demands and actions is an anticipatory breach and actual breach of the Contracts.  Plaintiffs have been damaged by this breach.

126.    Pilgrim materially breached paragraph 4 of the agreement regarding contract term.  Pilgrim has threatened Plaintiffs, in writing and verbally, by stating that if Plaintiffs did not exceed to Pilgrim's extra-contractual demands, such as expending hundreds of thousands of dollars to retrofit their poultry houses, or following the extra-contractual controls over the manner, means and method of work, Pilgrim would cease delivering chickens and terminate the

Plaintiffs' Original Complaint

agreements.  Under the Contracts, Pilgrim cannot require that Plaintiffs expend these funds and accede to these demands to extend the "term" of the Contracts.  This series of threats, demands and actions is an anticipatory breach and actual breach of the Contracts.  Plaintiffs have been damaged by this breach.

127.    Pilgrim    materially    breached    paragraph    5    of    the    agreement    entitled "representations and warranties of independent contractor."  Pilgrim has agreed and represented in the Contract that Plaintiffs would be treated as independent contractors under applicable law. In particular, Pilgrim agreed that it would not force Plaintiffs to be held out at "employee[s], agent[s], partner[s], representative[s] or joint venture[rs]" with Pilgrim.  However, in violation of this provision, Pilgrim has required Plaintiffs to invest funds as a partner or joint venture and has controlled the manner, means and methods of Plaintiffs as employees, while depriving Plaintiffs with an opportunity for profit.  Plaintiffs have been damaged by this breach.

128.    Pilgrim has materially breached paragraph 5 of the Contract which states that: "[Grower] will use its best efforts and devote such time and energy as may be reasonably necessary to fulfill its duties under this Agreement and to perform such duties in a professional manner."  Pilgrim has breached this provision by preventing Plaintiffs from expending such time and effort as would be "reasonably necessary" to fulfill their duties under the Contract, and requiring the expenditure of unnecessary time and effort for Pilgrim's sole benefit.  Plaintiffs have been damaged by this breach.

129.    Pilgrim has materially breached paragraph 6 of the Contract which states: "The Company will furnish all Broilers to be raised by the [Grower] and all feed, medication,

vaccines, catchers, and loaders utilized in the raising of same."  Pilgrim has breached this provision by delivering diseased, inferior, unhealthy chicks to Plaintiffs as punishment for perceived refusals to comply with extra-contractual and unreasonable demands; and by delivering inadequate quantities of feed to Plaintiffs as punishment for perceived refusals to comply with extra-contractual and unreasonable demands; by refusing to permit Plaintiffs to measure and weigh feed, test feed content, or examine chicks for genetic abnormalities and weaknesses; and by forcing Plaintiffs to absorb the financial loss caused by thin, unhealthy and dead birds caused by feed and chick placement.   Plaintiffs have been damaged by these breaches.

130.    Pilgrim has materially breached paragraph 7 of the Contract.  This provision reads as follows:  "in order to raise Broilers the Independent Contractor will furnish the following: housing facilities for the Broilers; all equipment and tools necessary to raise Broilers; feed tank(s) with an attached ladder in compliance with OSHA Regulations; litter; all utilities including heat and other essentials to insure that the environment is conducive to raising Broilers' and provide all weather road to feed tanks & chicks delivery doors."  Pilgrim has breached this provision by: (1) requiring Plaintiffs to pay for and install housing facilities in excess of those necessary to raise Broilers (including requiring Plaintiffs to pay for unnecessary and expensive curtains and unnecessary and expensive tunnel retrofitting equipment); (2) requiring Plaintiffs to pay for and install equipment and tools in excess of those necessary to raise Broilers; (3) requiring Plaintiffs to pay for increased utility charges accompanying Pilgrim's extra-contractual and unnecessary retrofits and equipment; (4) requiring Plaintiffs to

set the heat, schedules and other factors at Plaintiffs' houses in excess of the degree of control afforded an independent contractor; and (5) penalizing Plaintiffs for alleged but false failures regarding road conditions, feed tanks and chick delivery doors.  Plaintiffs have been damaged by these breaches.

131.   Pilgrim has materially breached paragraph 8 of the Contracts.  This provision reads:  "Expenses.  All expenses incurred by the [Grower] in performing the engagement(s) hereunder shall be borne by the [Grower]."  Pilgrim has breached this provision by requiring Plaintiffs to pay for expenses far in excess of those "incurred by the [Grower] in performing the engagements" under the Contracts.  In particular, Pilgrim has improperly charged to Plaintiffs the cost of unnecessary equipment changes, tunnel retrofit construction and equipment, increased utility charges caused by Pilgrim, and other expenses not required for the ordinary growing of broilers.  Plaintiffs have been damaged by these breaches.

132.   Pilgrim has materially breached paragraph 9 of the Contracts.  This provision reads:  "The [Grower] is not an employee of the Company; however, the Company shall have limited oversight of the [Grower's] Broiler house operations to ensure that the Broilers raised, caught and loaded meets the Company's Broiler Grower Methods and Practices program."  Pilgrim has breached this provision by: (1) treating Plaintiffs as employees under applicable law by not permitting Plaintiffs to control the manner, means and methods of operations or make a profit; (2) encumbering Plaintiffs with the financial burdens of an independent contractor while treating Plaintiffs as employees; (3) conducting more than "limited oversight" of Plaintiffs' broiler operations and intruding into the day-to-day rightful operations of Plaintiffs, while

threatening Plaintiffs with pay reductions and termination for failure to follow Pilgrim's detailed extra-contractual day-to-day controls and demands; and (4) conducting oversight and control of Plaintiffs' operations in excess of, and unrelated to, the Grower Methods and Practices provisions of the Contracts.  Plaintiffs have been damaged by these breaches.

133.    Pilgrim has materially breached paragraph 9 of the Contracts.  This provision reads:  "The Pilgrim's representatives shall provide instructions and recommendations on the manner and conditions regarding the raising of the Broilers."   Pilgrim has breached this provision by: (1) treating Plaintiffs as employees under applicable law by not permitting Plaintiffs to control the manner, means and methods of operations or make a profit; (2) encumbering Plaintiffs with the financial burdens of an independent contractor while treating Plaintiffs as employees; (3) issuing irrational and extra-contractual instructions and compulsory recommendations in excess of those necessary to safeguard broilers, while threatening Plaintiffs with pay reductions and termination for failure to follow Pilgrim's detailed extra-contractual day-to-day controls and demands; and (4) conducting oversight and control of Plaintiffs' operations in excess of, and unrelated to, the Grower Methods and Practices provisions of the Contracts.  Plaintiffs have been damaged by these breaches.

**F.     Count VI -     Detrimental Reliance and Anticipatory Breach of Contract**

134.    Plaintiffs repeat the allegations of each and every paragraph set forth above.

135.    Pilgrim has foreseeably and intentionally induced Plaintiffs – as its prospective employees – to materially change their position at their own expense and detriment, where such expenditures are for Pilgrim's sole benefit.  Such expenditures, for modification and retrofitting

of Plaintiffs' property and poultry houses were wrongfully charged to Plaintiffs to their expense and detriment.   Pilgrim thereafter repudiated its obligations under the contracts to permit Plaintiffs to own, operate and utilize the property and equipment purchased by dictated the manner in which such property and equipment was used, expended and devalued.

136.    Under the doctrines of detrimental reliance and anticipatory breach of contract, Plaintiffs are entitled to the immediate return of all funds expended in detrimental reliance upon Plaintiff's foreseeable and intentional inducements and misrepresentations that such expenditures would inure to Plaintiffs' benefit.

## G.    Count VII -    Conversion and Recoupment

137.    Plaintiffs repeat the allegations of each and every paragraph set forth above.

138.    As set forth above, Pilgrim has improperly converted, withheld and diverted proceeds that, but for its breaches of contract and fraud, would have been paid to Plaintiffs.  Bo Pilgrim has improperly converted and been paid proceeds that, but for his fraudulent and improper business practices, would have been paid to Plaintiffs and other growers.

139.    Plaintiffs seek the recoupment from Pilgrim of all proceeds wrongfully converted, held or wrongfully diverted from Plaintiffs as a result of the misapplication and wrongful failure to pay such funds to Plaintiffs.  Plaintiffs seek the repayment and recoupment from Bo Pilgrim of all proceeds wrongfully converted, wrongfully held or wrongfully diverted from Plaintiffs as a result of preferential contracts, insider information, misapplication and wrongful diversion of funds to Bo Pilgrim, whether directly or through corporations or entities under Bo Pilgrim's control.

Plaintiffs' Original Complaint

**H.     Count VIII -  Declaratory Relief**

140.     Plaintiffs repeat the allegations of each and every paragraph set forth above.

141.     Plaintiffs assert claims for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. 2201, against Pilgrim, as set out in this count.

142.     Inputs that determine and in the past have determined Plaintiffs' compensation, such as feed quality and chick quality, are currently, and in the past have been, under the sole control of Pilgrim.   These inputs are the relevant determinants for Plaintiffs' compensation under Pilgrim's tournament system.   Pilgrim's failure to allow Plaintiffs to have any control over inputs into the Pilgrim tournament pay system, combined with arbitrary, capricious and fraudulent manipulations of that system by Pilgrim to deliver favors and punishments, combined with the inability of Plaintiffs to engage in sound management practices without that information and in light of Pilgrim's improper micro-managing controls, creates a situation which is legally unfair, unjustly discriminatory, fraudulent, and a deceptive device.   Such conduct violates the Deceptive Trade Practices Act, Business and Commerce Code, Sections 17.50 et seq., and is a direct, actual, producing and/or proximate cause of Plaintiffs' damages. Plaintiffs seek an order from the Court declaring that these aspects of Pilgrim's conduct violate the Deceptive Trade Practices Act for the reasons stated above and for the following reasons:

(a)     Pilgrim has fraudulently, unfairly and for its own improper purposes manipulated the tournament ranking pay data and misrepresented the actual ranking to Plaintiffs;

(b)     Pilgrim has fraudulently, unfairly and for its own improper purposes engaged in a system of favoritism in which certain preferred growers are not required to make capital improvements or incur further debt or undergo severe, detailed discipline and control of operations, while other similarly situated non-preferred growers, including Plaintiffs, are required to take these actions, incur such debt and undergo such severe, detailed control and discipline;

(c)     Pilgrim has fraudulently, unfairly and for its own improper purposes engaged in a system of favoritism in which certain preferred growers are not threatened with termination and/or terminated, while other similarly situated non-preferred growers, including Plaintiffs, are threatened with termination and/or terminated;

(d)     Pilgrim has fraudulently, unfairly and for its own improper purposes engaged in a system of favoritism in which certain preferred growers receive superior quality chicks, while other non-preferred growers, including Plaintiffs, receive inferior, diseased, low growth and low survival rate chicks.

(e)     Pilgrim has fraudulently, unfairly and for its own improper purposes engaged in a system of favoritism in which certain preferred growers receive superior feed levels, deliver times and feed quality, while other non-preferred growers, including Plaintiffs, receive inferior feed levels, delivery times and feed quality.

(f)     Pilgrim has fraudulently, unfairly and for its own improper purposes engaged in a system of favoritism in which certain preferred growers receive superior chick delivery and

Plaintiffs' Original Complaint

mature bird pick up schedules, while other non-preferred growers, including Plaintiffs, receive inferior chick delivery and mature bird pick up schedules.

(g)     Pilgrim has, for its own improper purposes, prevented Plaintiffs from having their broilers examined by independent veterinarians.

(h)     Pilgrim has, for its own improper purposes, prevented Plaintiffs from testing feed placed on their own farms through independent laboratories.

(i)     Pilgrim has, for its own improper purposes, withheld from Plaintiffs access to chick quality information.

(j)     Pilgrim has, for its own improper purposes, withheld from Plaintiffs feed quality, feed content information, and basic nutritional ranges found in the rations provided to Plaintiffs.

(k)     Pilgrim has, for its own improper purposes, prohibited Plaintiffs from installing, on their own land, scales to weigh feed or broilers and to verify feed and boiler weights.

(l)     Pilgrim has, for its own purposes, prevented Plaintiffs from raising questions or concerns regarding Pilgrim growing practices without retaliation by Pilgrim in the form of write-ups, unnecessary and absurd required expenditures, intimidation, threatened termination and termination.

(m)     Pilgrim has, improperly and for its own purposes, required Plaintiffs to sign new contracts and unilateral amendments to existing contracts without consideration, attempting to shift all environmental risk and liability onto Plaintiffs and away from Pilgrim, by using improper methods of coercion and threats.

Plaintiffs' Original Complaint

(n)   Plaintiffs seek a declaration that the conduct set forth above is unfair, unjustly discriminatory, and a deceptive device.  Plaintiffs see a declaration that such conduct is also a direct, actual, and producing cause of Plaintiffs' damages, and violates the Deceptive Trade Practices Act.

(o)   Plaintiffs whose contracts were terminated by Pilgrims based upon the activities set forth above, seek a declaration reinstating that they are entitled to reinstatement without the coercion, Deceptive Trade Practices Act violations and improper activities set forth herein.

(p)   Plaintiffs seek a declaration that they are entitled to the information and access refused by Pilgrim and set forth above.

(q)   Plaintiffs seek a declaration that they are entitled to pay under the Contracts without manipulation of the ranking by Pilgrim.

(r)   Plaintiffs seek a declaration that they are entitled to pay under the Contracts with Pilgrim being responsible for capital improvements demanded by Pilgrim and inuring to the sole benefit of Pilgrim, such funds properly being a business debt of Pilgrim rather than Plaintiffs.

(s)   Plaintiffs seek a declaration that they are employees, rather than independent contractors, under applicable law, and that they are entitled to pay, back pay, overtime and all penalties set forth in the Fair Labor Standards Act, 29 U.S.C. 201-209.  In the alternative, Plaintiffs seek a declaration that they are partners of Pilgrim under common law.  In the

alternative, Plaintiffs seek a declaration that they are join venturers with Pilgrim under common law.

(t)     Plaintiffs seek a declaration reforming the Contracts so as to be consistent with all rulings by this Court, striking all provisions found to be legally invalid and/or in contravention of the Deceptive Trade Practices Act and/or the Fair Labor Standards Act, 29 U.S.C. 201-209.

(u)     Plaintiffs, including Don Lovell, a farmer forced to expend hundreds of thousands of dollars to convert all his poultry houses to air-conditioned retrofit houses, seek a declaration that the "expenses" referred to in paragraph 8 of the Contracts does not include additional, non-operating costs for the installation of additional equipment or retrofitting purely benefitting Pilgrim.

(v)     Plaintiffs seek a declaration that Pligrim has breached its Contracts with them by taking the actions set forth above and by requiring the expenditure of collectively millions of dollars in unnecessary retrofits and equipment changes purely benefitting Pilgrim, and by making Plaintiffs assume the debt for such retrofits and equipment changes as an additional, non-contractual condition of the Contracts.

(w)    Plaintiffs seek a declaration that Pligrim has breached its Contracts with them by taking the actions set forth above and by requiring the expenditure of collectively millions of dollars in unnecessary retrofits and equipment changes purely benefitting Pilgrim, and by making Plaintiffs assume the debt for such retrofits and equipment changes as an additional, non-contractual condition of the Contracts.

Plaintiffs' Original Complaint

(x)    Plaintiffs seek a declaration that Pligrim has breached its Contracts with them by taking the actions set forth above and by requiring the expenditure of collectively millions of dollars in unnecessary retrofits and equipment changes purely benefitting Pilgrim, and by making Plaintiffs assume the debt for such retrofits and equipment changes as an additional, non-contractual condition of the Contracts.

(y)    Plaintiffs seek a declaration that Pligrim and Bo Pilgrim have converted funds properly the property of Plaintiffs and that such funds be returned to Plaintiffs and directed by the Court.

143.    Plaintiffs seek an order declaring that, for the reasons set forth above, Pilgrim's conduct violates the Contracts.

**I.    Count IX -    Action for Accounting**

144.    Plaintiffs repeat the allegations of each and every paragraph set forth above.

145.    As set forth above, Pilgrim has steadfastly refused Plaintiffs' requests to furnish documentation of revenues, expenses, bird flock data, feed amounts, feed content, and data upon which its tournament ranking payments have been made.  Plaintiffs are entitled to this information to verify the propriety and veracity of Pilgrim's representations to them regarding revenues, expenses, bird flock data, feed amounts, feed content, and all data upon which its tournament ranking and payment is made to Plaintiffs and those growers preferred over Plaintiffs.

146.    Plaintiffs seek a full accounting of all revenues, expenses, bird flock data, feed data, and data upon which Pilgrim has paid Plaintiffs and all other growers within the East Texas grower market.

**J.     Count X -     Exemplary Damages**

147.    Plaintiffs repeat the allegations of each and every paragraph set forth above.

148.    Pilgrim and Bo Pilgrim engaged in the fraudulent, deceptive and improper conduct set forth above intentionally.   As such, Plaintiffs are entitled to the recovery of exemplary damages, as permitted by law (including treble damages under the Deceptive Trade Practices Act) for all such intentional wrongful conduct.

**K.     Count XI -     Order Prohibiting Retaliation**

149.    Plaintiffs repeat the allegations of each and every paragraph set forth above.

150.    In light of the long history of retaliation, economic punishment, threats and intimidating tactics by Pilgrims against Plaintiffs, seek an order prohibiting Pilgrim from taking any retaliation against Plaintiffs for the filing of this suit, including retaliatory termination or the improper violation or diminution of contractual benefits.

## IX.

## JURY REQUEST

151.    Plaintiffs hereby respectfully request a trial of these claims by jury.

# X.

# PRAYER

WHEREFORE, Plaintiffs request that Defendants be cited to appear and answer and that on final trial Plaintiffs have:

1.      For each and every cause of action set forth above, actual damages in excess of the jurisdictional limits of this Court in recompense for the losses to described above together with prejudgment and post judgment interest.

2.      Exemplary damages as set forth above in an amount of three (3) times the non-exemplary damages awarded;

3.      Declaratory relief as requested above;

4.      Attorneys' fees;

5.      Costs of suit; and

65.      Such other and further relief to which Plaintiffs may be justly entitled.

Respectfully submitted,

THE LAW OFFICE MIKE C. MILLER, P.C.
201 West Houston St.
Marshall, Texas 75670
Telephone:  (903) 938-4395
Facsimile:  (903) 938-3360


/s/Mike C. Miller                           
Mike C. Miller
Tex. Bar No:  14101100
Lisa M. Andrews
Tex. Bar No:  24053074

Plaintiffs' Original Complaint

BRODEUR LAW FIRM, PLLC
Mark C. Brodeur—Attorney in Charge
Tex. Bar. 03052020
17440 N. Dallas Parkway, Suite 262
Dallas, Texas 75287
Telephone: (972) 612-1660

COUNSEL FOR PLAINTIFFS